### DE LAMAR v. DE LAMAR MIN. CO.

(Circuit Court, D. Idaho. August 23, 1901.)

**1. PATENTS—ISSUANCE—PRESUMPTIONS.**

While there is a presumption in favor of the validity of a patent regularly issued, arising from such issuance, such presumption is not a conclusive one, so as to sway the judgment of the court, in an action relating to its validity, against the conviction naturally following from the evidence and the law.

**2. SAME—PRECIPITATION OF METALS—PATENT NO. 607,719.**

Patent No. 607,719, for a process of recovering precious metals from their solution, specified that it related to the recovery of precious metals from their solution by the use of a "definite quantity" of a finely-divided precipitating reagent in a state of agitation. In an action for infringement it was proved that, in order to use the process, it was necessary to use more zinc dust than was actually necessary to precipitate the solution, to prevent the process of the redissolution of the metals, which otherwise would immediately begin, and it was contended that by reason of such fact the specification was not concise and exact, so as to enable a person skilled in the art to make use of the same, as required by Rev. St. § 4888. *Held*, that the term "definite quantity," as used in the specification, should receive a liberal construction, and should not be limited in its meaning only to an amount of zinc dust necessary to properly precipitate the metals, but may mean the certain amount needed in either case to properly produce the result, as distinguished from an indefinite or unlimited amount, as was used in the older process.

**8. SAME—APPLICATION OF OLD PROCESS TO NEW USE.**

De Lamar patent, No. 607,719, issued July 19, 1898, for a process for recovering precious metals from their solution by the use of zinc dust in a state of agitation, is an old process applied to a new use, and is anticipated by prior publications and patents, and is therefore void.

Dickson, Ellis & Ellis, for complainant.
John H. Miller and Johnson & Johnson, for defendant.

BEATTY, District Judge. The complainant, the owner of patent No. 607,719, issued July 19, 1898, "for a process of recovering precious metals from their solution," brings this action against the defendant as an infringer. As gathered from the record of this case, the process known as the cyanide process for separating the precious metals from the ore state consists of pulverizing the ore and then subjecting it to an aqueous solution of cyanide of potassium. The pulverized ore and this solution being mingled, the cyanogen, an element in the solution, having a greater affinity for the gold and silver than for the potassium, unites with the former and forms a new solution. By subjecting this last solution to contact with zinc, the gold and silver are separated from the solution. Such was, and is, the general process. The complainant's contention is that, under the only processes in existence prior to his patent, zinc in some massive form, as in plates, shavings, etc., was used; that to mechanically reduce the zinc to any of these forms was a considerable expense; that it was not in any of these forms so minute that all of it would be reached by the solution, and as a result an amount of zinc beyond that actually needed to precipitate all the metal was necessarily used, which resulted in so fouling the solution with zinc that to some extent it was rendered unfit for future use; that it required much time to work the ores by this process; and that, prior to his patent, there was no process by which each particle of the necessary amount of zinc could be brought into contact with each atom of the precious metal contained in the solution, which, he claims, is done by the process described in his patent, and through which all the difficulties referred to in the prior processes are avoided. The patent specifies that it "relates to the recovery of the precious metals from their solutions by the use of a definite quantity of a finely-divided precipitating reagent in a state of agitation"; that the zinc alloys, shavings, turnings, etc., heretofore used, had to be used in excess of the quantity actually required for precipitation; that the by-product known as "zinc dust," being a very fine powder resulting from the manufacture of zinc products, is a cheap substitute, which can be used in the exact quantity which the solution may require for precipitation, for the use of which, with agitation, the claims provide. The chief improvement claimed by the patent over prior processes is that by the use of zinc dust, with agitation of it with the solution, it can be used in the exact quantity needed for precipitation, thus so avoiding the fouling of the solution with a surplus of zinc that it can again be used. If the court does not reach the correct result in the consideration of this cause, it will not be from want of either ability or diligence upon the part of counsel, for each party has been ably and faithfully represented. If the court does not, in its discussion of the issues, refer to all the questions and details presented by counsel, it is no reflection upon their judgment.

In this examination we start with the presumption in favor of the validity of the patent, which is but the logical conclusion of its issuance. This presumption, however, is but prima facie evidence, and is not of such conclusive weight as to sway the judgment of the court against the conviction naturally following from the evidence and the

law. We are justified in concluding this presumption is not controlling when we consider the great number of patents that the courts hold void. Either the courts or the patent office often err. The system, as it is, certainly is vicious. Almost it seems the practice is to issue patents and leave the courts to wrestle with the question of their validity, thus affording ample opportunity for the display of erudition upon technical subtleties at the expense and cruel disappointment of unfortunate patentees and litigants.

As understood by the court, the claim of the patent is for more than claimed, or than can be, by complainant. The third claim seems to include the entire process of extracting the precious metals from their ores: (1) Subjecting the ores in a pulverized state to the action of an aqueous solution of cyanide; (2) supplying to such solution the zinc dust; (3) the agitation of the solution and the zinc dust; and (4) recovering the precious metals from the precipitate resulting from the prior steps. Undoubtedly the first and last of these steps are old processes, and are not the invention of the patentee. The second and third are all, as is understood, that are claimed by complainant, or that can be within the protection of the patent. The important question, then, is whether, within the law, these constitute an invention by the patentee, and whether they are useful. What were the conditions—the state of the art—when the patentee commenced his investigations, and what changes or improvements did he make? Long before he commenced such investigation it was well known, and was in daily practice, that zinc was a valuable metal for the precipitation of the precious metals from a cyanide solution; in fact, it was the metal alone used in such solutions. It was also discovered that this precipitation was increased as the surface of the zinc used was increased. As with a given amount of zinc the surface would be increased as it should be divided into a greater number of parts, it resulted that, the finer the particles of zinc, the better it operated, by bringing it into contact with more of the solution carrying the metals. It followed that, instead of using the sheet or bar zinc, shavings, granules, and other forms of comminuted zinc were substituted. These different forms of zinc were used in different ways, but probably the most approved was to so pass the solution over a body of such zinc as that it could percolate through it. To even this there was the objection that it required more zinc than could be actually used, much of it not being reached by the solution. Also, to prepare zinc in the form found best was an item of considerable expense, as it had to be specially prepared for that purpose. It resulted that at the time the patentee, Waldstein, commenced his experiments, it was well established that zinc was the metal for this use, and that the finer it could be made, or the more surface that could be had for a given quantity of it, the better the results. There is no question that at this time zinc dust, or zinc fume, was a well-known article of commerce, and there is evidence that efforts had been made to use it for the precipitation of the precious metals; but, when used in large bodies of the solution, it was found to sink to the bottom of the vessel, or, if the effort were made to percolate the solution through it, it so clogged as to be impracticable, and was

pronounced a failure. There is no evidence that it was being used in a mill or in large operations until so used by Waldstein. This zinc dust is the most minute form to which zinc can be reduced. It is a powder. It fully meets the desirable object of presenting the most possible surface with a given amount of zinc. It is also cheap, being but a by-product from other operations. By being well mingled with the solution carrying the metals, it comes in contact with every part of the solution, thus precipitating more of the metals with the same amount of the zinc than in any other form that it can be used. It was an improved form over that before used; but, of course, as the patentee did not invent the form, he cannot, and does not, claim any rights for that, but he claims for the discovery and application of its use. Another difficulty confronted him, and those who had attempted its use. Being in such a fine powder, it readily packed or clogged when put into a solution, or when the attempt was made to percolate a solution through it. It can readily be seen how this would result, and that, with this difficulty in the way, it would not be as valuable as zinc shavings, or other forms of zinc which would not pack into a solid mass. This difficulty was overcome by Waldstein by such agitation of the solution and zinc dust as that the whole mass would be kept in motion and thoroughly commingled,—a very simple thing, it seems, but the only thing that made the zinc dust a most valuable precipitant, instead of a failure. So what Waldstein did was to use the zinc dust, and so put it in motion that it could be used. If in this there was an invention, it was chiefly in the principle of agitation. It cannot be doubted that with certain ores, at least, it was an improvement over former processes, and that it is useful. That it is of the great utility claimed is not shown by the facts; for, while it appears to be now used in several places, it also appears that it has not entirely supplanted the former process, which still seems to be successfully used.

An objection made to the patent is that the process described therein cannot be followed with any beneficial result; hence its lack of utility. The claim is that it provides for the use of only the exact amount of zinc dust necessary to precipitate the metal in the solution, the result of which would be that the dust being all used in the process of precipitation, there being in the solution an excess of cyanide, the process of a redissolution of the precious metals would immediately begin, by reason of the great affinity between them and the cyanide. It is claimed that an excess of zinc dust must always be used, and the evidence shows that such is the practice, even with those who adopt the process under this patent. Of the expert witnesses who have testified upon this subject, some say the directions of the patent cannot be successfully carried out, while others say its proper construction removes all difficulty. The statute (section 4888) says that the applicant for patent shall file in the patent office a written description of his discovery, "of the manner and process of making, constructing, compounding, and using it in such full, clear, concise, and exact terms as to enable any person skilled in the art or science to which it appertains * * * to make, construct, compound, and use the same." The patent, to me, unskilled in the

art, would seem to direct that exactly the amount, and no more, of the dust needed to precipitate the metal, should be used. It directs the use of a "definite quantity,"—the exact quantity which the solution may require. It is argued by the complainant that to one skilled in the art this means only that amount which is necessary to properly precipitate the metals and retain them in such precipitated state, which implies a slight excess over the exact amount needed for actual precipitation. "Definite quantity" may mean the certain amount needed in each case, as distinguished from an indefinite and unlimited, or any, amount, as was used in the older process; that the amount must be gauged by the actual necessity, as shown by proper calculation, instead of using by mere guess any indefinite amount. Certainly a specified amount cannot be named in the patent for all cases, for it must vary according to the nature of the ores and solution. While a very strict construction of the language of the patent might lead to the conclusion that it intended to specify that only the actual amount needed for precipitation should be used, yet I think a liberal construction should be placed upon it, and with that view I think one acquainted with the business of working ores could, from the description in the patent, follow it to a successful operation. If this is so, the patent conveys such a practical description of the process as brings it within the intent of the statute. While the patent might have been safely made more explicit, I doubt that this defect is of such gravity as to render it wholly void.

Another objection made is that this patent is but the application of an old process to a new use, or, as denominated in the patent law, a "double use." For the law upon this question, reference need be made only to the case of Manufacturing Co. v. Cary, 147 U. S. 623, 13 Sup. Ct. 472, 37 L. Ed. 307, wherein not only is there a full discussion of the law, but the authorities are collated. The patent in that case was concerning the tempering of coiled steel springs used in the construction of furniture. The court says:

"The claim limits the method to its application to 'furniture or other coiled springs'; but it appears from the evidence that the process, as applied to those springs, is in no respect different in method or effect from the same process when applied to any mechanically strained wire, or to steel made in straight pieces or strips, or otherwise. The claim covers broadly the described method of tempering applied to any coiled springs, as well as coiled springs for furniture; and if the evidence shows that, prior to Cary's invention, the method had been used for the restoration of any springs of strained steel, or other articles of strained steel, having resiliency, which is a well-known property of steel, the claim is substantially anticipated. Particularly if the method claimed had been used by others to restore articles of coiled spring steel, even though they were not used for furniture springs, the claim is anticipated."

Again:

"It is clearly shown by the witnesses for the defendant that, prior to Cary's alleged invention, wire clock bells and hair springs had been subjected to heat in the manner described in the Cary specification and with the same bluing effect. The treatment to which the articles were subjected was in all respects the same in the prior use as in the patented process. The only contention of the plaintiffs is that the purpose of the prior use was not the same, and that the results, so far as they were those of the patent, were accidental."

Also:

"In Smith v. Nichols, 21 Wall. 112, 22 L. Ed. 566, it was held that a mere carrying forward, or new or more extended application, of the original thought, a change only in form, proportions, or degree, the substitutions of equivalents, doing substantially the same thing in the same way, by substantially the same means, with better results, was not such invention as would sustain a patent; and in Roberts v. Ryer, 91 U. S. 150, 23 L. Ed. 267, it was held that it was no new invention to use an old machine for a new purpose, and that the inventor of a machine was entitled to the benefit of all the uses to which it could be put, no matter whether he had conceived the idea of the use or not."

And the court, after citing numerous authorities, says:

"The principle deducible from those cases is that it is not a patentable invention to apply old and well-known devices and processes to new uses in other and analogous arts."

As will be seen, the chief object of the patent was for the tempering, by heat, of coiled steel springs used in the construction of furniture; but the court held that it was anticipated by any prior process for tempering any other kind of springs, used for any other purpose, but particularly referred to the springs used in clocks, and held the patent void.

Let us now apply the law of this case to the facts in the cause here. The United States issued, February 25, 1868, its patent to Bischof & Kidwell for "improvement in preparing finely-divided iron and the separation of copper, silver, and other metals from their solutions." It describes the process of making iron powder from oxides of iron powder and the solutions, and then describes a revolving cask, in which are certain slats, or partial partitions, for thoroughly mixing the solution as the cask is turned on its axis, and says that the copper is precipitated almost instantaneously. The claims of this patent also include the "precipitation of metallic copper from its solutions by the use of finely-divided iron, and the use of finely-divided metallic copper * * * for separating silver from its solutions." The English patent, No. 5,407, issued November 16, 1883, to Astley P. Price, "for obtaining copper from cupreous solutions," specifies that it is for the—

"Precipitation of the copper from its solution or solutions, by the employment of zinc when in a state of fine division, such, for example, as that which is known as 'zinc fume,' or the condensated vapor of zinc. In carrying out my invention, I add, to the solution or solutions containing copper, zinc in a state of fine division, such as zinc fume, which is substantially metallic zinc in a state of fine division, and I cause the cupreous solution or solutions to be intimately mixed with the same, either by the injection of steam or of air, or by a mechanical agitation, in order that the copper existing in solution may be precipitated therefrom."

Without suggestion, it is evident that the process here described is the same as in the Waldstein patent, using the zinc dust or fume, and mechanical agitation, but for the precipitation of copper, instead of gold or silver. The Waldstein patent is but the application of this process to a new use; that is, for the precipitation of gold and silver, instead of copper. To the same general effect is defendant's Exhibit No. 9, the French patent to Messrs. Paraf-Javal, issued July, 1866. I am unable to see why the facts shown by these patents

do not bring this case within the rule established by the supreme court case above cited.

The law intends to protect by patent only those who actually invent,—those who discover and give to the world something that was unknown,—and not to confer upon a claimant that which he merely adopts from the suggestion and genius of others. Accordingly the statute provides by section 4886 that:

"Any person who has invented or discovered any new and useful art, * * * or any new and useful improvement thereof, not known or used by others in this country, and not patented or described in any printed publication in this or any foreign country, before his invention or discovery thereof, and not in public use or on sale, for more than two years, prior to his application, * * * may * * * obtain a patent therefor."

The defendant, in support of its claim that under this provision of the law the patent is void, has introduced a number of domestic and foreign patents and publications, a part of which, including those already referred to, will be noticed.

Defendant's Exhibit No. 8, English patent No. 18,146, granted to Sulman, August 17, 1895, is for the recovery of the precious metals from cyanide solutions by the use of zinc in an "extremely fine state of division." The patentee says he finds the best form of zinc for use is where it is obtained by "condensation from the metallic vapors given off in the distillation of zinc,—say, for example, the product from the flues and settling chambers." In the claims of the patent zinc dust or fume is named. The American patent to the same party, for which application was made February 25, 1895, and granted February 2, 1897, No. 576,173, refers to the use of metallic zinc vapor, generally known as "zinc dust or fumes." In connection with the question discussed in this case as to the value of zinc oxide, it may be noted that in this patent a part of the process described consists in "purifying the fumes or dust of zinc of oxides." This patent includes the use of zinc dust purified of its oxide, and the agitation of its mixture. Defendant's Exhibit No. 11 is the English patent, No. 5,125, to Astley Paston Price, October 29, 1883, which is for the "extraction of the precious metals from their ores, and from compounds," etc. It provides for the use of zinc or other metals than copper in a state of fine division, and for the agitation of the mixture, either by the injection of steam, air, or by mechanical means. In the subsequent patent to the same party, and above referred to (No. 5,405), it is added to his specifications that the zinc dust used is that which is known as "zinc fume," or the condensed vapor of zinc. The last patent, however, refers to the precipitation of copper.

Among the publications referred to are defendant's Exhibit No. 20, a German publication, published at Leipsic, October 17, 1890, describing the process for the recovery of silver and gold from cyanide of potassium solutions, in which it is stated that, "for precipitating gold, agitate the mixture with zinc dust." Defendant's Exhibit No. 19 is also a German publication, published at Berlin, August 23, 1890, for "the recovery of silver and gold from used cyanide of potassium liquids," in which the use of zinc dust shaken or stirred is described. This article is republished in the Scientific American

Supplement, at New York, January 31, 1891. Defendant's Exhibit No. 21 is another German publication of October 29, 1892, in which it appears that gold may be recovered from cyanide of potassium liquids, with the aid of zinc dust, by repeated shakings.

These various patents and publications clearly show that, long prior to complainant's patent, the process claimed by it was substantially described. It has been argued that the zinc dust named in some of these exhibits was not the article referred to in complainant's patent; but the suggestion is not well supported. Not only was it a well-known article, but in some of the exhibits it was especially described. Moreover, when an article has a known name, why, when that is used, can there be any reason to conclude that something else is meant? Were this the rule, surely there could be nothing in a name. It need scarcely be added that it is immaterial whether or not the patentee knew of these publications, but some of them were made at his own home. The law, however, only provides for the fact of publication, and not for the knowledge of it. Many authorities, in the argument of this case, have been cited, apparently pointing to different conclusions. When all the facts concerning them, and the peculiar questions appertaining to the patent law, are fully considered, the probabilities are that they are consistent with each other; but it may be doubted that it is the province of this trial court, after having carefully examined, to undertake here to fully review, them. The authorities cited by complainant concerning foreign publications are to the effect that they must be so full and clear as to enable any person skilled in the art or science to which they appertain to practice the invention to the same practical extent as they would be enabled to do if the information were derived from a prior patent. These publications seem to me to be so similar to the specifications of the patent that one skilled in the art would readily reach the latter from the suggestions of the former.

After a most careful and laborious examination of this cause, being convinced that the complainant's patent is subject to the defenses that it is an old process applied to a new use, and that it is anticipated by prior publications and patents, without further discussion of the other questions raised, the conclusion is that a decree be, and is, ordered for defendant, with its costs. In the absence of counsel, some of whom reside at a distance, 40 days' time is given them, after notice of this decision, in which to take such further steps in the cause as any of them may desire.