## WARE v. PRATT & WHITNEY AIR-CRAFT CO. et al.

### No. 1052.

District Court, D. Delaware.
July 10, 1937.

John F. Neary and Worthington Campbell (of Hoguet, Neary & Campbell), both of New York City, for plaintiff.

Drury W. Cooper and Drury W. Cooper, Jr. (of Cooper, Kerr & Dunham), both of New York City, and Howard Duane, of Wilmington, Del., for defendants.

NIELDS, District Judge.

This is a patent infringement suit by Raymond Ware, patentee and owner of the patent, against the Pratt & Whitney Aircraft Company and United Aircraft Manufacturing Corporation, defendants. The bill of complaint charges defendants with infringing claims 1, 3, and 5 of the Ware patent No. 1,864,384 granted June 21, 1932. The defenses are noninfringement and invalidity.

The Wright Aeronautical Corporation of Paterson, N. J., and Pratt & Whitney Aircraft Company, the latter now merged into and forming a division of United Aircraft Manufacturing Corporation, divide the business in this country in the larger sizes of aviation engines. In May, 1930, the Wright Company had an epidemic of scuffing or seizures of its pistons causing failures running as high as 1 and 4 engines and resulting in a shutdown. The problem was assigned to the company's engineers who tried various piston designs, clearances, materials, etc. Finally, engineers Chilton and Gagg tried out a tapered part at a very slight angle to each end of the skirt of the piston. When such tapering was, adopted, 100 engines were run through without a failure and since then the scuffing and scoring of the Wright pistons and cylinders has ceased. As a result of the Chilton work, the angle of the taper adopted by the Wright Corporation at each end of the piston was one-half degree with relation to the piston side wall. That angularity has been retained ever since and is applied now to all Wright's pistons in current production. Chilton and Gagg filed an application for patent and were called upon to file a statement of their conception date. Since their conception date was not as early as the filing date of the Ware application, no interference was declared. The Ware patent issued in June, 1932, and the application of Chilton and Gagg was rejected and abandoned. Thereafter on December 31, 1932, the Wright Company acquired a license under the Ware patent. Prior to the adoption of the taper, the practice of the Wright Company was to form a juncture of the wall surface of the piston and the end either square or by a coarse chamfer or a bevel of substantial angle all of which were ineffective for entraining oil.

Before considering what the Ware patent covers, it may be well to consider what it does not cover. What is the scope and meaning of the Ware patent? The brief and argument on behalf of plaintiff distort the patent by reading into the patent certain limitations not found there. Those limitations are:

(1) That the Ware patent has to do only with pistons for airplane engines or other "internal combustion engines of high output."

(2) That the tapers of the Ware patent "initiate" a film of oil on which the pis-

ton rides or "planes" and also "initiate" planing.

(3) That an essential feature of the taper of the Ware patent is "tangency" at the point where the taper meets the cylindrical bearing surface.

These three points are fundamental in plaintiff's argument respecting the Ware patent and may be further elaborated.

(1) We are not dealing with Chilton's problem of aircraft engines but with the Ware patent. The title of the Ware patent is merely "Piston." The drawings show a piston which might be any usual piston with rings at the head end and a skirt portion tapered at the top and bottom. The specification begins: "This invention relates to pistons and more particularly to the pistons of internal combustion engines of high output, although it will be apparent that the principles involved are applicable to all other mechanisms using pistons, such as reciprocating pumps and air compressors." The patent is applicable to all kinds of pistons in all kinds of engines. The patentee says: "The object of my invention is to overcome the inherent defects of the conventional piston." Further on he says: "The piston of Fig. 1 may be assumed to be an aluminum type automobile piston." References to automobiles negative any limitation to airplanes. Each claim of the patent calls merely for "A piston" without specifying the material of which it is to be made or whether it is to be used in an air compressor, reciprocating pump, automobile, airplane, or other internal combustion engine.

(2) Plaintiff's requested finding of fact No. 23 is that defendant's pistons "initiate" planing. As to that, plaintiff's expert testifies:

"Q. 167. With tapers of the order of magnitude about which you have testified in those charts, what would you say is the effect of such tapers in the operation of the engines containing such pistons? A. That such tapers would have an effect upon the film conditions between the piston and the cylinder surface.

"Q. 168. What effect? A. The effect of changing what you might call the hydraulic set-up or the velocity diagram.

"Q. 169. What would they do in operation, in your opinion? A. They would tend to thicken the film, and that I think would be the greatest effect that they would have and reduce the chances of metallic contact.

"Q. 170. How would they function in comparison with the character of the taper disclosed in the Ware patent? A. Do you mean as far as the piston bearing itself is concerned? They would have somewhat the same effect.

"Q. 171. What effect would that be? A. The effect I have just explained, an improvement in the film conditions between piston and cylinder wall.

"Q. 172. As a practical matter, what in your opinion is the difference as far as concerns the character of lubrication in providing tapers of that order and providing tapers of the order disclosed in the Ware patent? A. It would be simply one of degree.

"Q. 173. What difference in operation would it make in the functioning of the piston? A. I think the difference is of the same order of the differences that occur between different engines.

"Q. 174. What effect on the initiation of planing is had by providing a taper angularly disposed to the side wall of the piston rather than one which merges tangentially? A. I think it would be one of degree.

"Q. 175. What would be the effect in those particular pistons, 8, 9 and 10, as far as concerns the initiation of planing, in your opinion? A. They would reduce the time that the piston took to form a bearing film and generally assist at the initiation of such film."

That a change in degree only, and not in kind, does not rise to the dignity of invention, has been decided by the courts many times. Plaintiff's expert again emphasized on redirect examination that the Ware patent merely increased the oil film, as does the prior art, and does not initiate. He testified: "The basic objective of the Ware patent is the improvement of the film-bearing conditions between piston and cylinder."

(3) The idea of tangency was expressly given up in the proceedings in the patent office leading to the grant of a patent and plaintiff is attempting to construe the claims to cover something which not only is not there but which was expressly given up in the prosecution of the patent. On pages 6 and 7 of the file wrapper and contents of the patent in suit are found claims which the patentee projected but which were all rejected by the patent office on patents which were cited. We can take projected claim 1 as an example·

"1. In a fluid pressure piston, the combination with a substantially cylindrical bearing thrust surface, of an axially curved convex relieved portion adjoining and axially tangent to the thrust surface, the space between said relieved portion and the cylinder wall providing a combined oil reservoir and oil wedge for the oil film lubrication of the thrust surface on the outward strokes of the piston."

Here we have a patentee asserting that the tapers must be "tangent," yet the Patent Office rejected these claims by office action dated December 24, 1931, and the patentee acquiesced in this rejection by canceling them in amendment dated February 19, 1932. Once more the patentee asserted the idea of tangency, in the following language "with no break in the smooth continuity of the surface," but again upon rejection the patentee canceled the idea. Thereafter the patentee did not project a claim with the idea of tangency in it. Yet plaintiff is now trying to read into the claims in suit that the tapers should be "axially tangent," a term which was given up.

With the three alleged limitations of the Ware patent above recited eliminated, what is the patent? Of the three claims relied upon, claim 3 may be taken as typical:

"3. A piston having a substantially cylindrical bearing skirt portion, each end of which is progressively reduced in diameter, starting at a point the distance of which from the end of the relieved portion does not exceed twenty per cent of the total length of the skirt portion, so as to form wedgeshaped oil reservoirs at both ends of the bearing surface from which oil is entrained to lubricate the same on the side towards which the thrust load is acting."

During the final argument, counsel for plaintiff stated the essential characteristics of the Ware patent. "There are two things, the length of the taper and the degree of angle. The maximum degree of angle is 5 degrees. It shall not exceed 5 degrees and shall not include more that 20% of the total length of the skirt of the piston."

The defense mainly relied upon in this suit is invalidity arising from the prior publications, patents, and use.

The publication "The Elements of Machine Design," by Unwin, published in 1907 by Longmans, Green & Co., illustrates various cross-heads and locomotive and stationary engine pistons with rounded ends (apparently tangential to the piston bearing surface) to entrain and ride an oil film.

The publication "Hand Book for Engineers and Machine Designers," published in 1922, contains the following:

"When considering the design, construction and lubrication of bearings, one should have in mind the fundamental laws relating thereto. * * * In the light of what is now known concerning these laws, it follows that in the operation of a properly designed, constructed and lubricated bearing the following * * * principles are definitely established:

"(a) The bearing surfaces are completely separated by a supporting film of oil.

"(b) The friction of operation is the fluid friction in the oil film, and adequate thickness of film is essential.

"(c) During construction, proper clearance or space should be provided for the normal thickness of oil film.

"(d) The advance edge of a bearing surface must be rounded or chamfered off in order to permit a supporting film of oil to form."

Rounding or chamfering, which is the same thing as tapering the leading edges, will entrain the oil.

Unger patent No. 1,561,379 issued November 10, 1925, and owned by defendant discloses a piston "particularly adapted for use in gas engines" or other "internal combustion engines, especially the high powered and high speed type used in motor vehicles." The Unger piston has a piston ring head portion, a cylindrical bearing surface, each end of which is progressively reduced in diameter. The wrist pin bearings are located approximately midway of the length of the skirt or cylindrical bearing portion. Reliefs at each end of the cylindrical bearing surface provide wedge-shaped oil reservoirs from which a film of oil is entrained between the cylindrical surface and the wall of the cylinder toward which the thrust load is acting. In the Unger patent there are no sharp corners anywhere which would cause a scraping action. Unger patent was granted more than two years before the Ware patent was applied for and is a complete anticipation of claims 1 and 5 of the Ware patent. Claim 3 of the Ware patent calls for tapers or reliefs each of which are less than 20 per cent. of the total length of the skirt portion. The Unger patent illustrates

tapers which are more than 20 per cent. Such difference is matter of engineering choice or skill.

Hanch patent No. 1,504,448 was granted August 12, 1924, and discloses a piston which is "fundamentally a conventional piston" and which has a piston-ring head portion, a cylindrical bearing portion which occupies the major part of the length of the skirt with the piston pin about midway the length of the skirt. The tapers at both ends of the skirt provide oil reservoirs from which a film of oil is entrained between the cylindrical surface and the wall of the cylinder towards which the thrust load is acting. Claims 1, 3, and 5 of the Ware patent are fully anticipated by the disclosure of the Hanch patent.

Moorhouse patent No. 1,687,878 was granted October 16, 1928, and discloses a piston for an internal combustion engine with a piston-ring head portion, a cylindrical bearing portion, each end of which is progressively reduced in diameter forming tapers of unlike dimensions. The tapers are less than 20 per cent. of the total length of the skirt and form wedge-shaped oil reservoirs from each of which a film of oil is entrained between the cylindrical surface and the wall of the cylinders on the side towards which the thrust load is acting. The Moorhouse patent further contemplates "that the rounding off of the lower end of the piston skirt may be extended upwardly a little farther on that side of the piston where there is the greatest pressure on the firing stroke so that a greater amount of oil will be fed to that side of the piston and cylinder than to the other." This patent clearly contains the concept that the taper controls the depth of the oil film and the planing action. It also contains the concept that by changing the angle or form of the taper the amount of oil that is taken in to the film between the piston skirt and the cylinder wall may be controlled. Claims 1 and 3 of Ware patent are fully anticipated by the disclosure of the Moorhouse patent. Claim 5 of Ware patent calls for wrist pin bearings located approximately midway the length of the skirt portion of the piston. The Moorhouse patent illustrates wrist pin bearings which are not located approximately midway the length of the skirt portion of the piston. Such differences are matters of engineering choice or skill and the form shown in the Ware patent is admitted by plaintiff's expert to be old.

The public use of the Buffalo Gasolene Motor Company at Buffalo, N. Y., took place more than two years prior to the filing of the application for the Ware patent. It was proved beyond a reasonable doubt. The facts are: There were at least three stationary internal combustion engines (which are still in use) made and sold by Buffalo Gasolene Motor Company in the regular course of business, which contained aluminum alloy pistons, each of which consisted in a piston-ring head portion and cylindrical bearing surface. The top and bottom tapers of the Buffalo piston are each 3/16 of an inch in length on a piston skirt 5¾ inches long. The tapers are at angles of three degrees to the skirt of the piston. The purpose of these tapers was to do away with the sharp corner which would scrape oil. They provided wedge-shaped oil reservoirs from which a film of oil is entrained between the surface and the wall of the cylinder on the side towards which the thrust load is acting. Claims 1 and 3 of the Ware patent are fully anticipated by the prior use of the Buffalo Gasolene Motor Company. Claim 5 of Ware patent calls for wrist pin bearings located approximately midway the length of the skirt portion of the piston. The Buffalo piston contains wrist pin bearings which are not exactly midway the length of the skirt portion of the piston. Such difference is matter of engineering choice or skill and the form shown in the Ware patent is admitted by plaintiff's expert to be old. It is apparent that the Buffalo piston fulfills the requirements of plaintiff's counsel's definition upon the argument, and the claims in suit read precisely upon it.

The public use of the Packard Motor Car Company took place more than two years prior to the filing of the application for the Ware patent. The facts are: There were over 15,000 Packard automobiles made and sold by the Packard Motor Car Company employing engines which contained pistons consisting of a piston-ring head portion, cylindrical bearing surface, with the wrist pin bearings being located approximately midway of the length of said bearing portion. The lower end of the cylindrical bearing surface was progressively reduced in diameter by means of a straight taper at an angle of 6° 45' to the bearing surface and approximately 3/32 of an inch long, which is less than 20 per cent. of the total length of the bearing surface. The straight taper ended in a rounding off by a curved taper of 1/64 of an

inch radius so as to provide a wedge-shaped oil reservoir from which a film of oil is entrained between the surface and the wall of the cylinder on the side towards which the thrust load is acting. Claims 1, 3, and 5 of the Ware patent are fully met by the prior use of the Packard Motor Car Company with the exception that the Packard taper is placed only at the bottom of the skirt or cylindrical bearing surface and not at both ends as called for by said claims. This difference is a matter of engineering choice or skill.

■ Plaintiff, however, argues that none of the pistons of the prior art were in the environment of the Ware patent. But concede this. An old means to produce a new result in the same art or an analogous art does not amount to invention. There are numerous cases upon this proposition. In an early case the Supreme Court said:

"It is no new invention to use an old machine for a new purpose. The inventor of a machine is entitled to the benefit of all the uses to which it can be put, no matter whether he had conceived the idea of the use or not."

And further:

"There was no change in the machine: it was only put to a new use. If there was any change of construction suggested, it was only to increase its capacity for usefulness. It was 'a mere carrying forward or new or more extended application of the original thought, a change only in form, proportions, or degree, doing substantially the same thing in the same way, by substantially the same means, with better results.' This is not such an invention as will sustain a patent. We so decided no longer ago than the last term, in Smith v. Nichols, 21 Wall. 112 [22 L.Ed. 566]. Clearly we think, therefore, the invention of Sanford was anticipated by Lyman; and his patent is, on that account, void." Roberts v. Ryer, 91 U.S. 150, 157, 159, 23 L.Ed. 267.

The Court of Appeals for the Third Circuit said:

"It is well settled that the application of an old process or machine to a similar or analogous subject with no change in the manner of application, and without any substantially different result, will not sustain a patent. Roberts v. Ryer, 91 U.S. 150, 23 L.Ed. 267; Pennsylvania Railroad Co. v. Locomotive Engine Safety Truck Co., 110 U.S. 490, 4 S.Ct. 220, 28 L.Ed. 222; Mast, Foos & Co. v. Stover Manufacturing Co., 177 U.S. 485, 20 S.Ct. 708, 44 L.Ed. 856; Motion Picture Patents Co. v. Calehuff Supply Co., Inc. (C.C.A.) 251 F. 598; Guardian Trust Co. v. Downington Manufacturing Co. (C.C.A.) 29 F.(2d) 887. It follows that the patent must be held to be invalid." United States Hoffman Mach. Corp. v. Pantex Pressing Mach., 44 F.(2d) 685, 688. Certiorari denied, 282 U.S. 904, 51 S.Ct. 217, 75 L.Ed. 796.

Plaintiff relies on Eibel Process Co. v. Paper Co., 261 U.S. 45, 43 S.Ct. 322, 326, 67 L.Ed. 523. This case is distinguished from the one at bar by the following language of the report:

"The Eibel invention is distinguished from the prior art in two ways: First, in that the pitch of the wire was for a different purpose, to be accomplished, not at the dandy roll some twenty or more feet from the breast roll, but at a point only 9 or 10 feet from there; and, second, by the fact that to achieve his purpose a high or substantial pitch must be given to the wire, while only a small or trivial pitch was needed for the drainage of the prior art."

It thus appears that in the Eibel Case not only was the result obtained by the prior art different, but also that the means were different. In the case at bar we have shown that the means were the same.

The defense of invalidity is sustained which renders consideration of the defense of noninfringement unnecessary.

This opinion contains a statement of the essential facts and of the law applicable thereto in conformity with Equity Rule 70½ (28 U.S.C.A. following section 723).

The bill of complaint must be dismissed.