E.I. DU PONT de NEMOURS & COMPANY, Plaintiff–Appellant,

v.

PHILLIPS PETROLEUM COMPANY, Phillips 66 Company, and Phillips Driscopipe, Inc., Defendants–Cross–Appellants.

Appeal Nos. 87–1259, 87–1284.

United States Court of Appeals, Federal Circuit.

June 15, 1988.

John O. Tramontine, Fish & Neave, New York City, argued, for plaintiff-appellant. With him on the brief, were Edward F. Mullowney, Glenn A. Ousterhout and Thomas J. Vetter.

Philip S. Beck, Philip C. Swain, Kirkland & Ellis, Chicago, Ill., argued, for defendants-cross-appellants. With him on the brief, were Harry J. Roper and George S. Bosy, Neuman, Williams, Anderson and Olson, Chicago, Ill.

Before BISSELL, Circuit Judge, and MILLER, Senior Circuit Judge.[*]

BISSELL, Circuit Judge.

E.I. du Pont de Nemours & Company ("Du Pont") appeals from a judgment of the United States District Court for the District of Delaware, *see E.I. du Pont de Nemours & Co. v. Phillips Petroleum Co.*, 656 F.Supp. 1343, 2 USPQ2d 1545 (1987), that Du Pont failed to prove that the infringement of claims 1, 2, 5, 10, 12 and 14 of its U.S. Patent No. 4,076,698 ('698) was willful. Phillips Petroleum Company, Phillips 66 Company, and Phillips Driscopipe, Inc. (collectively, "Phillips"), the alleged infringers, cross-appeal from the district court's judgment that Du Pont proved infringement and that Phillips failed to prove invalidity under 35 U.S.C. §§ 102(g), 103 (1982 & Supp. III 1985), and unenforceability due to inequitable conduct. We affirm in part, reverse in part, vacate in part, and remand for further proceedings consistent with this opinion.

## BACKGROUND

Polymers are large molecules formed when a smaller molecule, known as a monomer, joins chemically to itself in a repeating fashion. Forming a copolymer[1] involves joining different monomers. In Du Pont's invention, ethylene, a monomer, is copolymerized with a "higher alpha-olefin." This is a hydrocarbon having between 5

---

[*] Circuit Judge Archer heard oral argument in these appeals but subsequently recused himself, taking no position in the decision of this case.

1. *i.e.,* "interpolymer."

and 18 carbon atoms with a single double bond at one end.[2]

The copolymers of the six claims at issue are in part defined by their properties. Consider, for example, claim 5:

> 5. An interpolymer of ethylene and a higher olefinic hydrocarbon having 5 to 10 carbon atoms per molecule, said higher olefinic hydrocarbon having one terminal $-CH = CH_2$ per molecule and no other olefinic unsaturation, said interpolymer being further characterized in that it has an X-ray crystallinity in the range of 40 to 70%, a melt index in the range of 0.3 to 20, a density in the range of 0.9 to 0.95 and said interpolymer being further characterized in that its density is not less than 0.93 unless the content of said higher olefinic hydrocarbon in the interpolymer is at least 3% by weight.

The remaining claims are similar, though claim 1 requires a certain "Elmendorf tear strength," and claim 12 requires as specified hoop stress. All six claims are reproduced in the Appendix below.

Du Pont filed its original patent application on March 1, 1956, and a continuation-in-part (CIP) application, S.N. 632,416, on January 4, 1957. The '698 patent issued from the CIP application on February 28, 1978, to Anderson and Stamatoff. The delay in issuance was partially due to an interference proceeding before the Board of Patent Interferences at the United States Patent & Trademark Office (PTO). As originally filed, the application contained both product and process claims. However, the process claims were cancelled following the interference proceeding, leaving 15 product claims in the '698 patent.

In 1981, Du Pont filed the infringement suit now on appeal. Phillips in its Answer and Counterclaim alleged invalidity, unenforceability, and noninfringement. In a bifurcated trial, the court tried the liability issues from July 21, 1986 through August 18, 1986. During the district court proceedings, the PTO conducted a merged reissue/reexamination proceeding of the '698 patent that culminated, on May 12, 1986, with a final rejection of all the claims. On June 11, 1986, Du Pont appealed that rejection to the PTO Board of Patent Appeals and Interferences but that appeal was stayed as of August 6, 1986.

Included in the prior art Phillips relied on at trial were the three items relied on in the appeal: (1) the 1955 work of Witt and Leatherman—researchers for Phillips; (2) Vandenberg U.S. Patent No. 3,058,963; and (3) Brown U.S. Patent No. 2,728,752.

At trial, Du Pont conceded that Phillips, through the work of Witt and Leatherman, made ethylene/higher alpha-olefin copolymers in the United States before the date of the claimed invention. However, Du Pont claimed that its copolymers could be distinguished from those of Phillips because of two properties disclosed in its patent specification but not expressly written into the claims. The district court accepted Du Pont's argument, incorporated those two properties as limitations into the six claims at issue, and determined that the claims were not invalid, not unenforceable, and infringed but not willfully.

## ISSUES

1. Whether the district court erred in incorporating two extraneous property limitations into the claims.

2. Whether the district court erred in holding that the claims were not invalid under 35 U.S.C. § 102(g).

3. Whether the district court erred in holding that the claims were not invalid under 35 U.S.C. § 103.

4. Whether the district court erred in holding that the patent was not unenforceable.

5. Whether the district court clearly erred in finding that the claims were infringed.

6. Whether the district court applied the incorrect standard of proof regarding willful infringement.

## OPINION

I. Validity

A. *Claim Interpretation*

■ The district court believed that the essence of Du Pont's invention is that its

---

**2.** In comparison, a "lower alpha-olefin" would have 3–4 carbon atoms.

copolymers, when compared with "free-radical polyethylene, with linear polyethylene and with comparable copolymers of ethylene ... and the lower alpha-olefins," possess superior (1) environmental stress crack resistance and (2) impact strength. *Du Pont*, 656 F.Supp. at 1350, 2 USPQ2d at 1547. The district court interpreted the claims as including those two properties. In doing so, it erred.

The significance of claims in defining an invention was clearly expressed by our predecessor court in *Autogiro Co. of America v. United States*, 181 Ct.Cl. 55, 384 F.2d 391, 395–96, 155 USPQ 697, 701 (1967):

> The claims of the patent provide the concise formal definition of the invention. They are the numbered paragraphs which 'particularly [point] out and distinctly [claim] the subject matter which the applicant regards as his invention.' 35 U.S.C. § 112. It is to these wordings that one must look to determine whether there has been infringement. [Footnote omitted.] Courts can neither broaden nor narrow the claims to give the patentee something different than what he has set forth. [Footnote omitted.] No matter how great the temptations of fairness or policy making, courts do not rework claims. They only interpret them.

In accordance with that instruction, this court has consistently adhered to the proposition that courts "cannot alter what the patentee has chosen to claim as his invention." *SSIH Equipment S.A. v. U.S. Int'l Trade Comm*, 718 F.2d 365, 378, 218 USPQ 678, 689 (Fed.Cir.1983) (citing *Autogiro*); *see also Loctite Corp. v. Ultraseal Ltd.*, 781 F.2d 861, 867, 228 USPQ 90, 93 (Fed. Cir.1985) ("Generally, particular limitations or embodiments appearing in the specification will not be read into the claims."). Indeed, neither Du Pont nor the district court cites any case of this court reading extraneous limitations into a claim.

■ It is entirely proper to use the specification to interpret what the patentee meant by a word or phrase in the claim. *See, e.g., Loctite Corp. v. Ultraseal Ltd.*, 781 F.2d 861, 867, 228 USPQ 90, 93 (Fed.

Cir.1985). But this is not to be confused with adding an extraneous limitation appearing in the specification, which is improper. By "extraneous," we mean a limitation read into a claim from the specification wholly apart from any need to interpret what the patentee meant by particular words or phrases in the claim. "Where a specification does not *require* a limitation, that limitation should not be read from the specification into the claims." *Specialty Composites v. Cabot Corp.*, 845 F.2d 981, 987 (Fed.Cir.1988) (emphasis in original), citing *Lemelson v. United States*, 752 F.2d 1538, 1551–52, 224 USPQ 526, 534 (Fed.Cir. 1985).

Although the district court cited as support *United States v. Adams*, 383 U.S. 39, 86 S.Ct. 708, 15 L.Ed.2d 572, 148 USPQ 479 (1966), *Adams* does not support reading into the claims extraneous limitations from the specification. *Adams* involved claims to a battery comprising a combination of various claimed elements, none of which was water. Adams argued that the battery, unlike prior art batteries, could be successfully and unexpectedly operated with water. Though using water was not expressly included in the claims, that unexpected feature was relevant to the Court's decision on nonobviousness. *See, e.g., Graham v. John Deere*, 383 U.S. 1, 17–18, 86 S.Ct. 684, 693–94, 15 L.Ed.2d 545, 148 USPQ 459, 467 (1966) (objective indicia are probative of nonobviousness).

It was not necessary for the Court in *Adams* to read, and the Court did not read, a "water" limitation into the claims. The Court discussed the water feature only when considering rebuttal of defendant's argument of obviousness. Properly interpreted, *Adams* does not deviate from this language in a Supreme Court precedent that *Adams* refers to for authority:

> [W]e know of no principle of law which would authorize us to read into a claim an element which is not present, for the purpose of making out a case of novelty or infringement. The difficulty is that if we once begin to include elements not mentioned in the claim in order to limit such claim and avoid a defense or antici-

pation, we should never know where to stop.

*McCarty v. Lehigh Valley R. Co.*, 160 U.S. 110, 116, 16 S.Ct. 240, 242–43, 40 L.Ed. 358 (1895) (cited in *Adams*, 383 U.S. at 48–49, 86 S.Ct. at 712–13, 148 USPQ at 482).

Du Pont contends that *Decca Limited v. United States*, 190 Ct.Cl. 454, 420 F.2d 1010, 164 USPQ 348 (1970), *cert. denied*, 400 U.S. 865, 91 S.Ct. 102, 27 L.Ed.2d 104 (1970), supports the district court decision. It is mistaken. The claims at issue in *Decca* were written in "means plus function" format, which are subject to the last paragraph of 35 U.S.C. § 112. Hence, resort to the specification in *Decca* was necessary not only pursuant to the normal rule of resorting to the specification to interpret what the patentee meant by claim language, but also, pursuant to statute.

Although language in *Decca* and other Court of Claims decisions may have given the perception that claims are to be "saved" from invalidity by reading extraneous limitations into them, *see, e.g., SSIH Equipment S.A. v. USITC*, 718 F.2d 365, 385, 218 USPQ 678, 695 (Fed.Cir.1983) (Smith, J., concurring in part, dissenting in part), this court's consistent approach in interpreting claims, and in rejecting resort to extraneous limitations from the specification, should have negated that perception by now. *See Sjolund v. Musland, Norsol, Inc. and Wink Corp.*, 847 F.2d 1573, 1582 (Fed.Cir.1988) ("limitations from the specification are not to be read into the claims"). Thus, the district court was wrong as a matter of law in reading into the claims at issue the two extraneous property limita-

tions mentioned above. The remainder of this opinion, and the proceedings on remand below, shall treat the claims as not containing those limitations.

### B. *Novelty—35 U.S.C. § 102(g)*

The novelty issue relates to 35 U.S.C. § 102(g), which states that a person is entitled to a patent unless "before the applicant's invention thereof the invention was made in this country by another who had not abandoned, suppressed, or concealed it."

■ The claims in this case fall into two groups. One group—claims 2, 5, 10 and 14—contains limitations pertaining only to density, percent crystallinity, melt indices, percent monomer, and type of monomer. Independent claim 5, reproduced above, is representative. Du Pont has conceded that the Witt and Leatherman copolymers of Phillips made in this country before the Du Pont invention, satisfied those limitations.[3] Because it is conceded that the copolymers of claims 2, 5, 10 and 14 are anticipated by the prior work of Phillips, we reverse the district court's determination with respect to these claims, and hold these claims invalid.

The second group of claims—claims 1 and 12—must be addressed on remand. Those two claims include a limitation not present in the other four claims and not conceded by Du Pont to be present in the Witt and Leatherman copolymers. Claim 1 includes this limitation: "when in the form of a film, an Elmendorf tear strength in the range of 150 to 400 grams per mil." Claim 12, which claims the copolymer in the form

---

**3.** At trial, Du Pont conceded as follows:

DuPont judicially admits that before the date of DuPont's invention of the patent in suit, Gerald T. Leatherman and Donald R. Witt, researchers at Phillips, made in the United States copolymers of ethylene with propylene, ethylene with 1–butene, ethylene with 1–pentene and ethylene with 1–hexene. That those ethylene with 1–pentene copolymers had comonomer-type, density, melt index, percent crystallinity and weight percent comonomer content falling within the ranges expressly called for by the claims asserted against Phillips in this action.

That those ethylene–1–hexene copolymers had comonomer-type, density, percent crystallinity and weight percent comonomer content falling within the ranges expressly called for by the claims asserted against Phillips in this action and melt indices of 0.19 and 0.27.

DuPont will not attempt to prove in this action that the invention of the patent in suit was made by DuPont before the dates that those ethylene–1–pentene copolymers and ethylene–1–hexene copolymers were made by Gerald T. Leatherman and Donald R. Witt.

of pipe, recites a limitation to impact strength in terms of hoop stress. To find anticipation of claims 1 and 12, the district court must determine that Phillips met its burden of proving by clear and convincing evidence that the copolymers it made prior to Du Pont's invention possessed those properties. *See American Hoist & Derrick Co. v. Sowa & Sons, Inc.*, 725 F.2d 1350, 1360, 220 USPQ 763, 771 (Fed.Cir.), *cert. denied*, 469 U.S. 821, 105 S.Ct. 95, 83 L.Ed.2d 41 (1984).

Phillips asserts, citing *Titanium Metals Corp. of America v. Banner*, 778 F.2d 775, 227 USPQ 773 (Fed.Cir.1985), that the strength limitations of claims 1 and 12 are merely property limitations that cannot serve to distinguish the claims from the Witt and Leatherman copolymers. In *Titanium*, the claims covered, for example, a "titanium based alloy consisting essentially by weight of about 0.6% to 0.9% nickel, 0.2% to 0.4% molybdenum, up to 0.2% maximum iron, balance titanium, said alloy being characterized by good corrosion resistance in hot brine environments." The reference upon which both the Patent Office and the court based their § 102 rejections showed an alloy with those percentages, and the court stated:

Congress has not seen fit to permit the patenting of an old alloy, known to others through a printed publication, by one who has discovered its corrosion resistance or other useful properties, or has found out to what extent one can modify the composition of the alloy without losing such properties.

*Id.*, 778 F.2d at 782, 227 USPQ at 778.

■ *Titanium*, however, does not mean that property limitations can never have meaning in a claim. On occasion, particularly with polymers, structure alone may be inadequate to define the invention, making it appropriate to define the invention in part by property limitations. As the district court here recognized in assessing the issues under 35 U.S.C. § 112, "if the

claims, read in light of the specification, reasonably apprise those skilled in the art both of the utilization and scope of the invention, and if the language is as precise as the subject matter permits, the courts can demand no more." *Hybritech Inc. v. Monoclonal Antibodies, Inc.*, 802 F.2d 1367, 1385, 231 USPQ 81, 94 (Fed.Cir.1986), *cert. denied*, — U.S. —, 107 S.Ct. 1606, 94 L.Ed.2d 792 (1987).[4]

Here, the district court found that "[t]he ethylene-higher alpha-olefin copolymers of the invention are characterized by several parameters so that they can be distinguished by external tests from linear ethylene homopolymers and from linear ethylene copolymers that are rubber-like." *Du Pont*, 656 F.Supp. at 1350, 2 USPQ2d at 1547. The district court concluded that those parameters "are measurements of comonomer content, density, and percent crystallinity." *Id.* However, the district court implicitly used additional parameters to help define the claimed invention because it read into the claims the two property limitations discussed above in Part I, A, and considered the Elmendorf strength of claim 1 and hoop stress of claim 12 in determining validity and infringement.

Furthermore, Du Pont's expert, Dr. Beasley, testified that "if process parameters are not identical in two polymerizations intended to make ethylene copolymers using the same monomers, the resultant copolymer will probably have different properties." The district court accepted that and noted: "the court now assumes that Phillips is not urging the theory initially espoused by Dr. Price that compounds that have the same general chemical structure will have the same properties regardless of how they are made." Thus, the district court found the interpolymer actually produced depends in part on the process used to prepare it. *Du Pont*, 656 F.Supp. at 1365, 2 USPQ2d at 1560.

■ It is clear, therefore, that the district court correctly regarded the claimed

4. *Compare Seattle Box, Inc. v. Industrial Crating & Packing, Inc.*, 731 F.2d 818, 826, 221 USPQ 568, 574 (Fed.Cir.1984) (the test for adequacy under § 112 ¶ 2 is "whether one of ordinary skill in the art would understand what is claimed when the claim is read in light of the specification").

interpolymers as compositions that can be permissibly defined in terms of structure and properties. Thus, the issue is not, as in *Titanium*, whether one can get a patent on discovering a new property of an old composition of matter. The issue is whether the claimed copolymer, as defined in part by various property parameters, is new. In *Titanium*, once the alloy disclosed in the prior art reference was determined to possess the structural limitations of the claim, the burden shifted to the applicants to show that the alloy disclosed in the reference did not possess the claimed property. Here, however, Phillips has not shown that their interpolymers of ethylene and higher alpha olefins possess the property limitations set forth in the claims.

As the one challenging validity, Phillips must prove on remand that the strength limitations of claims 1 and 12 are possessed by the Witt and Leatherman products. *See Tyler Refrigeration v. Kysor Industrial Corp.*, 777 F.2d 687, 689, 227 USPQ 845, 846–47 (Fed.Cir.1985) (identity of invention is question of fact and challenger must show that each element of claim is found in a prior patent or publication, either expressly or under principles of inherency). In meeting that burden, Phillips need not prove awareness by Witt and Leatherman that their products possessed the properties. Also, Phillips is entitled to rely not only on the Witt and Leatherman patent application and its corresponding foreign patent applications, but also on the notebook data presented by Phillips. The district court did not allow Phillips to use that data regarding the two improper claim limitations discussed above in Part I, A, because it determined that the data on stress crack resistance was "abandoned, suppressed, or concealed." *Du Pont*, 656 F.Supp. at 1355–56, 2 USPQ2d at 1551–52. That was legally incorrect if 35 U.S.C. § 102(g), as opposed to the Federal Rules of Evidence, was used as the basis of excluding the data. The inquiry under § 102(g) allows Phillips to use any relevant

data to prove its defense unless the information is otherwise untimely produced.

### C. *Nonobviousness*

■ As the district court recognized, determining nonobviousness is a legal question based on factual underpinnings. *Graham v. John Deere Co.*, 383 U.S. 1, 17–18, 86 S.Ct. 684, 693–94, 15 L.Ed.2d 545, 148 USPQ 459, 567 (1966); *Panduit Corp. v. Dennison Mfg. Co.*, 810 F.2d 1561, 1566–68, 1 USPQ2d 1593, 1596–97 (Fed.Cir.), *cert. denied*, —— U.S. ——, 107 S.Ct. 2187, 95 L.Ed.2d 843 (1987). Changing the definition of the claims used by the district court by eliminating the two limitations it improperly read into the claims may affect a number of those factual inquiries and the legal conclusion itself. Because of that, we deem it appropriate for the district court to reassess the nonobviousness of claims 1 and 12 as properly defined. We can review that legal assessment, in any subsequent appeal, for error or the underlying fact findings for clear error.

However, because the district court applied an incorrect test in excluding the work of Witt and Leatherman as prior art for § 103 purposes, we give guidance to the court on one aspect of one of the factual underpinnings of nonobviousness, the "scope and content of the prior art." *Id.* Specifically, we now address when § 102(g) prior work can be used as § 103 prior art.

■ The district court in excluding the work of Witt and Leatherman applied a test derived from *In re Clemens*, 622 F.2d 1029, 1039–40, 206 USPQ 289, 299 (CCPA 1980): the work of another under § 102(g) is prior art under § 103 only when that work is known to the art or to the patentee before he made the invention. *See, e.g., Kayton on Patents*, 5–28 (2d ed. 1983). Applying that test, the district court held that Phillips' prior work was not usable in a § 103 context "[b]ecause Phillips' work was kept secret and was unknown to both the du Pont researchers and the art." [5] *Du*

---

5. Because work is "secret" does not necessarily mean that it has been "abandoned, suppressed or concealed." The latter determination depends on the overall facts of each case. For

example, the filing of a United States patent application, as Phillips did here, maintains the secrecy of work, but is a factor cutting against abandonment, suppression or concealment. In

*Pont,* 656 F.Supp. at 1363, 2 USPQ2d at 1558. The district court also relied on *Kimberly–Clark Corp. v. Johnson & Johnson,* 745 F.2d 1437, 223 USPQ 603 (Fed.Cir.1984), and Phillips contends that *Kimberly–Clark* eliminated the test of *Clemens.* We agree with Phillips.

*Kimberly–Clark* distinguished as dictum the *Clemens* requirement of applicant's personal knowledge because "§ 102(g) contains no personal knowledge requirement." 745 F.2d at 1445, 223 USPQ at 607. Nor does § 102(g) contain a "known to the art" requirement apart from the requirement of no abandonment, suppression or concealment. Hence, the alternative *Clemens* requirement that the prior work be "known to the art" is also implicitly dismissed as dictum. That implication is further supported by the conclusion in *Kimberly–Clark* that certain prior work at issue, solely because it satisfied § 102(g) (i.e., it was reduced to practice and had not been abandoned, suppressed or concealed), could be used for § 103 purposes. *Id.,* 745 F.2d at 1444, 223 USPQ at 606; *see also Hybritech Inc. v. Monoclonal Antibodies, Inc.,* 802 F.2d 1367, 1371 n. 1, 231 USPQ 81, 84 n. 1 (Fed.Cir.1986) (§ 102(g) prior art can be used for § 103).

■■■ The concurring opinion in *In re Bass,* 474 F.2d 1276, 177 USPQ 178 (CCPA 1973), properly characterized the proposition for which *Kimberly–Clark* stands by stating:

> [t]he term 'prior art' as it is used in 35 U.S.C. § 103 should include all inventions which were made in this country before an applicant or patentee made his invention, regardless of when those inventions are made public or patent applications on them are filed, so long as those inven-

tions are found not to have been abandoned, suppressed, or concealed.

474 F.2d at 1292, 177 USPQ at 190. Moreover, although *Kimberly–Clark* concluded there was no abandonment, suppression, or concealment because of a filed patent application that issued, *Kimberly–Clark* does not *require* that a patent application be filed or a patent be issued before § 102(g) prior work can qualify as § 103 prior art.

Certainly the court in *Kimberly–Clark* was concerned about "secret prior art." 745 F.2d at 1446, 223 USPQ at 607. Nevertheless the requirement of proving no abandonment, suppression, or concealment does mollify somewhat the "secret" nature of § 102(g) prior art. Despite its concern over "secret prior art," the court in *Kimberly–Clark* allowed prior work to be used as prior art in a § 103 context so long as it satisfied the requirements of § 102(g). As stated in the concurring opinion in *Kimberly–Clark,* the majority opinion "has extended the scope of what constitutes the prior invention of another, under § 102(g), to encompass the prior work of another which has been reduced to practice." 745 F.2d at 1460, 223 USPQ at 619 (footnote omitted).[6]

## II. Infringement

As indicated above, we reverse the district court's claim interpretation with respect to the two property limitations "read into" the claims and, with respect to the judgment that Phillips has not proven invalidity, we reverse for claims 2, 5, 10 and 14 and vacate for claims 1 and 12. Thus, the judgment of infringement must also be vacated. However, on the infringement issue it is appropriate for judicial economy to review Phillips' challenge to the district court's interpretation of the density and

any event, Du Pont conceded that the prior Phillips work has not been abandoned, suppressed or concealed, e.g., it admits in its reply brief that the Witt and Leatherman work is "available as a defense of prior invention under Section 102(g)." In that regard, the Phillips' work was the subject of foreign patent applications, speeches at various conferences, and papers presented at American Chemical Society meetings.

6. The effect of using § 102(g) for § 103 purposes is limited by the Patent Law Amendments Act of 1984. Pursuant thereto, this sentence was added to 35 U.S.C. § 103: "Subject matter developed by another person, which qualifies as prior art only under subsection (f) or (g) of section 102 of this title, shall not preclude patentability under this section where the subject matter and the claimed invention were, at the time the invention was made, owned by the same person or subject to an obligation of assignment to the same person."

crystallinity parameters appearing in claims 1 and 12.

## A. *Density*

Phillips urges that the "0.95" limitation appearing in the claims means "0.950" and that the district court incorrectly interpreted "0.95" as meaning between 0.9451 and 0.9550. Consequently, Phillips urges that the district court incorrectly found that Phillips' products, having a density between 0.9501 and 0.9550, literally infringed the claims at issue.

▌ Phillips urges that during the prosecution history Du Pont made arguments on the meaning of the density that are contrary to the district court's interpretation. We agree with Phillips that arguments made during the prosecution history are relevant in determining the meaning of the terms at issue. Those arguments, and other aspects of the prosecution history, as well as the specification and other claims, must be examined to ascertain the true meaning of what the inventor intended to convey in the claims. *Loctite Corp. v. Ultraseal Ltd.*, 781 F.2d 861, 867, 228 USPQ 90, 93–94 (1985). Using the prosecution history in that manner is different from prosecution history estoppel, which is applied as a limitation upon the doctrine of equivalents after the claims have been properly interpreted. *Id.*, 781 F.2d at 870, 228 USPQ at 96. The district court here incorrectly assumed that prosecution history can be used only in the latter regard. After noting that "Phillips advanced five prosecution history estoppel arguments related to the claim parameters of density, crystallinity and comonomer content in an effort to restrict the scope of the asserted claims," *Du Pont*, 656 F.Supp. at 1388, 2 USPQ2d at 1579, the court concluded that none of the arguments "involve the classic situation for estoppel, such as if Du Pont had narrowed a claim by amendment and now sought to require what was given up by resort to the doctrine of equivalents." *Id.*

In interpreting "0.95" the district court referred to the specification and to "customary scientific notations." *Id.* at 1385, 2

USPQ2d at 1577. However, during prosecution Du Pont argued that a density between 0.950 and 0.955 was not within the scope of its claims. This position is inconsistent with the claim interpretation Du Pont now urges. Specifically, the examiner rejected Du Pont's pending claims, stating in part: "Since the polymers disclosed by the [Field and Feller (F & F)] references have densities *within the scope* of applicants' claims ... it is not seen how the instantly claimed copolymers differ from those of the references." (Emphasis added.) In response, Du Pont argued:

> [W]herever given in Field and Feller, the densities of the 'normally solid hydrocarbon material' polymerization product, where some olefinic material, other than propylene, was included in the reaction mixture with ethylene, were in the range of linear polyethylene homopolymers (0.954—0.97) rather than in the range (0.9 to 0.95) of the novel branched polyethylenes (ethylene 1–olefin copolymers) claimed by applicants.

The examiner posited in the rejection that the F & F densities, including one of 0.9547, were within the scope of Du Pont's claims (0.9 to 0.95), but that was contested by Du Pont.

Du Pont argues that the examiner, in subsequently withdrawing his rejection, placed no reliance on the 0.95 density recitation to distinguish F & F. That misses the point. Regardless of the examiner's motives, arguments made during prosecution shed light on what the applicant meant by its various terms. Not only did Du Pont argue that an F & F density of 0.954 fell outside the scope of its claims but also, regarding the next highest F & F density, 0.9557, Du Pont stated that it was "far above" any densities of applicant's unique, branched polyethylenes. Du Pont also stated that the F & F density of 0.9585 had a "quite high density."

In light of that prosecution history, as well as other factors such as the patent specification, the district court should ascertain on remand the meaning of the density parameter. If the court determines that the parameter has changed, it should

reassess infringement. We caution, however, that even if the district court decides in light of the prosecution history to redefine the density as 0.950, and accordingly, changes its finding of literal infringement for those products of Phillips having a density between 0.9501 and 0.9550, the issue of infringement under the doctrine of equivalents must be addressed by the court. As indicated in *Loctite Corp. v. Ultraseal Ltd.*, 781 F.2d 861, 871, 228 USPQ 90, 96 (Fed.Cir.1985), merely because certain prosecution history is used to define the claims more narrowly, there still *may* be—even in light of that same prosecution history—an appropriate range of equivalents under the doctrine of equivalents.

## B. *Crystallinity*

On crystallinity, Phillips urges that the 70% maximum limitation means "70%," not "70% ± a variance of 10%–20%" as interpreted by the district court. As with density, the district court seemed to find prosecution history relevant only in an estoppel context. That, again, is incorrect. With Phillips' interpretation, products over 70% would not literally infringe; with the district court's interpretation, some were held to infringe literally.

■ The district court seemed to ignore arguments made during the reissue/reexamination proceeding that prior art polymers including those with crystallinity of 38%, 32%, and 38% were "outside the scope of appellant's claims." Statements made during reissue are relevant prosecution history when interpreting claims. *See, e.g., Howes v. Medical Components*, 814 F.2d 638, 645, 2 USPQ2d 1271, 1275 (Fed.Cir. 1987); *Standard Oil Co. v. American Cyanamid Co.*, 774 F.2d 448, 452, 227 USPQ 293, 296 (Fed.Cir.1985).

It is relevant to the claim interpretation here that Du Pont urged that something 2% off the claimed lower limit of 40% is not in the range, yet later argued for a variance of 10%–20% off the upper limit. As with density, therefore, we instruct the district court judge on remand to reassess the meaning of the crystallinity parameter. Again as with density, however, even if the

district court redefines the parameter as "70% without variance," the issue of infringement under the doctrine of equivalents must still be addressed.

## C. *Remand Instructions*

On remand, the district court should ascertain the meaning of a density of "0.95" and a crystallinity of "70%." If it means "0.950" density or "70% without variance" crystallinity, infringement will have to be reassessed under the doctrine of equivalents for those Phillips products having a density over 0.950 or a crystallinity over 70%. However, the instruction to reassess the definitions of "0.95" and "70%" does not affect the infringement determination unchallenged on appeal for those infringing Phillips products that have a density below 0.950 and a crystallinity less than 70%.

## III. Inequitable Conduct

■ Phillips alleges as inequitable conduct (1) Du Pont's failure to inform the PTO about the alleged status of Du Pont's Rule 131 affidavit, and (2) Du Pont's improper selection of data. The district court rejected those arguments apparently because it found that Phillips failed to prove by clear and convincing evidence that the alleged misrepresentations were material. Phillips has not shown us that those findings were clearly erroneous, *J.P. Stevens & Co. v. Lex Tex Ltd.*, 747 F.2d 1553, 1562, 223 USPQ 1089, 1094 (Fed.Cir.1984), *cert. denied*, 474 U.S. 822, 106 S.Ct. 73, 88 L.Ed.2d 60 (1985), nor that the conclusions of no inequitable conduct were otherwise incorrect. In reaching that conclusion in the context of this case, we are reminded of this admonition of *Kimberly–Clark v. Johnson & Johnson*, 745 F.2d 1437, 1454, 223 USPQ 603, 614 (Fed.Cir.1984): " 'Fraud in the PTO' has been overplayed, is appearing in nearly every patent suit, and is cluttering up the patent system."

## IV. Willfulness

■ The district court decided that Du Pont did not prove willfulness by clear and convincing evidence, although it stated that

Du Pont would have proven infringement if the standard of proof had been a preponderance of the evidence. Du Pont argues on appeal that willful infringement need only be proved by a preponderance of the evidence. *Du Pont*, 656 F.Supp. at 1394, 2 USPQ2d at 1584. That is legally incorrect. As this court stated in *Shatterproof Glass Corp. v. Libbey–Owens Ford Co.*, 758 F.2d 613, 628, 225 USPQ 634, 644 (Fed.Cir.1985): "[t]he jurisprudence ... uniformly requires clear and convincing evidence in support of increased damages."

Du Pont cites *Orthokinetics, Inc. v. Safety Travel Chairs, Inc.*, 806 F.2d 1565, 1569, 1583, 1 USPQ2d 1081, 1083, 1094 (Fed.Cir.1986). There the court did not specifically focus on the proper standard to apply, but, when discussing the procedural history at the district court it stated generally that the "54 jointly prepared questions ... [submitted to the jury] ... recognized the appropriate burdens to be met by each of the parties as well as the corresponding standard of proof with respect to each issue." *Id.* at 1569, 1 USPQ2d at 1083. One of the standards, not discussed in the opinion, is revealed by question 24, contained in the APPENDIX to the opinion: "Do you find that Orthokinetics has proved by a preponderance of the evidence that the infringement of the ['867] patent by any of the following defendants was willful?"

Obliquely, therefore, *Orthokinetics* might support Du Pont's position. However, *Orthokinetics* never focused on the issue, and we conclude that *Orthokinetics* never intended to change the proper test stated in *Shatterproof.*

### DECISION

In view of the foregoing: (1) the district court's claim interpretation is (a) reversed insofar as it has "read into" the claim two extraneous property limitations, and (b) vacated insofar as it has interpreted a density limitation of "0.95" to mean "0.9451–0.9550" and a crystallinity limitation of "70%" to mean "70% ± 10–20%"; (2) the district court's judgment that Phillips did not prove invalidity under 35 U.S.C. § 102(g) is reversed for claims 2, 5, 10, and 14 and vacated for claims 1 and 12; (3) the district court's judgment that Phillips did not prove invalidity under 35 U.S.C. § 103 is vacated for all claims; (4) the district court's judgment that Phillips did not prove unenforceability is affirmed; (5) the district court's judgment that Du Pont proved infringement is vacated; and (6) the district court's judgment that Du Pont did not prove willful infringement is affirmed. This case is remanded for further proceedings consistent with this opinion.

### COSTS

Costs are awarded to Phillips.

AFFIRMED IN PART, REVERSED IN PART, VACATED IN PART AND REMANDED.

### APPENDIX

1. An interpolymer composed of interpolymerized comonomers consisting essentially of ethylene and at least one normal aliphatic mono-alpha-olefinic hydrocarbon containing from 5 to 10 carbon atoms per molecule, the proportion of said monoolefinic hydrocarbon being from 3 to 7% of the weight of the interpolymer, said interpolymer having a melt index within the range of 0.3 to 20, and, when in the form of a film, an Elmendorf tear strength in the range of 150 to 400 grams per mil, and a density of 0.93 to 0.94.

2. An interpolymer of ethylene and from 1% to 20% by weight of a higher olefinic hydrocarbon having 5 to 18 carbon atoms per molecule, said higher olefinic hydrocarbon having no non-aromatic unsaturation other than one terminal $-CH=CH_2$ per molecule, said interpolymer having essentially no other copolymerized components, the proportion of the interpolymerized ethylene component therein being not less than 80% nor more than 90% by weight, the percentage crystallinity of the interpolymer being such that the density ranges from 0.95 at 1% interpolymerized higher olefinic hydrocarbon down to 0.9 at 20% interpolymerized higher olefinic hydrocarbon.

5. An interpolymer of ethylene and a higher olefinic hydrocarbon having 5 to 10 carbon atoms per molecule, said higher olefinic hydrocarbon having one terminal $-CH = CH_2$ per molecule and no other olefinic unsaturation, said interpolymer being further characterized in that it has an X-ray crystallinity in the range of 40 to 70%, a melt index in the range of 0.3 to 20, a density in the range of 0.9 to 0.95 and said interpolymer being further characterized in that its density is not less than 0.93 unless the content of said higher olefinic hydrocarbon in the interpolymer is at least 3% by weight.

10. Composition of claim 5 in the form of a film.

12. Composition of claim 5 in the form of pipe which is further characterized by withstanding 3000 hours at hoop stress of 750 psi and a temperature of 60°C.

14. A composition of claim 5 having a density in the range of 0.910 to 0.945 and a melt index in the range of 0.3 to 2.1.