**WATSON & CHALIN MANUFACTURING, INC., Plaintiff,**

v.

**The BOLER COMPANY, Defendant.**

**Case No. 4:01–CV–266.**

United States District Court, E.D. Texas, Sherman Division.

Oct. 4, 2002.

---

Robert M. Parker, Tyler, TX, Peter Kerr Munson, Munson Munson Pierce & Cardwell, Sherman, TX, Michael Edwin Jones, Potter Minton, Tyler, TX, Smith, Guy E. Matthews, Carroll Vernon Lawson, The Matthews Firm, Houston, TX, for plaintiff.

James Corley Henderson, Wolfe Clark Henderson & Tidwell, Sherman, TX, Andy Wade Tindel, Attorney at Law, Tyler, TX, Mark J. Skakun, Philip R. Wiese, Bucking-ham Doolittle & Burroughs LLP, Akron, OH, David P. Dureska, Buckingham Doolittle & Burroughs, Canton, OH, for defendant.

## *MEMORANDUM OPINION AND ORDER*

DAVIS, District Judge.

On August 15, 2002, the court conducted a claim construction hearing in this matter. After considering the submissions of the parties and arguments of counsel, the court issues the following order construing the claims of the patent-in-suit.

## *BACKGROUND*

Plaintiff Watson and Chalin Manufacturing, Inc. ("Watson") accuses Defendant The Boler Company ("Boler") of infringing claims 1, 2, and 9 contained in United States Patent 4,793,953 ("the '953 patent"). The abstract of the '953 patent states that the patent discloses "a device for stabilizing an air spring dumping trailer during dumping operations." At the heart of the parties' dispute concerning the proper construction of claims 1,2 and 9 is the effect of the terms "dumping trailer" and "dumping operations," which are used throughout the patent. Watson asserts that such language merely discloses an intended use or purpose of the claimed apparatus, while Boler contends that by including such references throughout the patent, Watson has expressly limited the scope of the '953 patent to cover only dumping trailers that are involved in dumping operations.

In order to understand the parties' contentions in this case, it is necessary to explain a portion of the prosecution history of the '953 patent. As originally filed, Claims 1, 2 and 9 stated as follows:

Claim 1. A pivot stop for a dumping trailer comprising:

(a) a plurality of primary frame members;

(b) a hanger extending downward from each of said primary frame members;

(c) an arm pivotally connected to each of said hangers;

(d) an axle seat attached to each of said arms;

(e) a set of air springs extending between said axle seats and said primary frame members;

(f) a cantilever section of each of said arms extending beyond said axle seats;

(g) chock means mounted to said cantilever sections in said primary frame members for transferring load from said primary frame members to said arms.

Claim 2. An air spring suspension dump trailer stabilizing device comprising:

(a) a support frame to which the trailer is mounted;

(b) a plurality of hangers connected to said support frame;

(c) an arm member pivotally connected to each of said hangers;

(d) an axle seat affixed to each of said arm members;

(e) air springs extending from said axle seats to said support frame;

(f) load transfer means affixed to a cantilever section of said arm members, said load transfer means serving to transfer load from said support frame to said arm members during dumping operations.

Claim 9. A device for stabilizing an air spring suspension dump trailer during dumping operations comprising:

(a) a support frame;

(b) a plurality of axle seats;

(c) plurality of air springs extending from said support frame to said axle seats;

(d) a plurality of hangers affixed to said support frames;

(e) a plurality of arm members have proximal and distal ends, said proximal end of each of said arm members being pivotally connected to said hangers with said axle seats being connected to said arm members between said proximal and distal ends;

(f) a first set of chocks mounted to said arm members between said axle seats and said distal ends;

(g) a second set of chocks affixed to said support frame, said first set of chocks contacting said second set of chocks during dumping operations.

Claims 2 and 9 were allowed by the United States Patent and Trademark Office ("USPTO") as originally filed. Claim 1, however, was rejected by the patent examiner under 35 U.S.C. § 103 as being obvious to a person having ordinary skill in the art in view of a patent obtained by Franklin B. Easton ("the Easton patent"). The examiner found that "Easton shows a pneumatic suspension system for a vehicle with frame members [ ], hanger [ ], arms [ ], axle seat [ ], air springs, [ ], and stabilizing chock means [ ]" and that "[i]t would have been obvious to employ Easton's suspension system on a dump vehicle."

In response to the examiner's rejection of Claim 1, Watson amended element (g) of claim 1 as follows:

(g) *a plurality of* chock *s* [means] mounted to [said cantilever section in] *and extending downward from* said primary frame members for *contacting each of said cantilever sections of said arms and for* transferring load from said primary frame members to said arms [.] *during dumping operations* (brackets indicating language deleted; underlining indicating language added).

Also, in response to the rejection of Claim 1, Watson made the following argument: the shock absorber [ ] taught by Easton is not the load transfer means that the chocks are in the present application. There is nothing in the Easton patent which suggests the use of such a suspension system for a dumping trailer. Further, there is nothing in the Easton patent which suggests that Easton has ever recognized the need to distribute load across the rear pivot arm of the trailer to prevent excess wear and stress on the bushings connecting the pivot arm to the hanger. That being the case, it is difficult to understand how Examiner concludes that it would be obvious to employ Easton's suspension on a dump trailer. It is also difficult to understand

the classification of Easton's shock absorber [ ] as a chock means.

Claim 1 has been amended herein to more clearly distinguish the present invention from the structure described by Easton.

Subsequently, the examiner conducted an interview with the applicant's attorney. During this interview, the parties agreed that "[a]mendments to the claims were approved in order to more particularly set forth the invention and to correct informalities." As a result of the parties' agreement, the USPTO provided a Notice of Allowability of Claims 1–9. Thereafter, the '953 patent issued with nine claims, originally filed claims 2–9 and amended claim 1.

A significant portion of Boler's argument concerning claim construction revolves around the effect of language in the '953 patent referring to "dumping trailers" and "dumping operations." Boler contends that this language limits the scope of the patent to dumping trailers engaged in dumping operations because (1) Watson distinguished the claimed apparatus from the Easton patent by adding the phrase "dumping operations" to element (g) of claim 1, (2) Watson argued, in response to the examiner's initial rejection of claim 1, that the Easton patent did not suggest "the use of such a suspension system for a dumping trailer," (3) a reference to "dumping" appears in both the preamble and element (g) of Claim 1, and (4) the terms "dumping trailers" and "dumping operations" appear throughout the '953 patent.

Watson asserts that its responsive remarks to the patent examiner's rejection of Claim 1 did not relate to the patentability of the claim as the patentability of an apparatus cannot be established over a prior art reference based on a different intended use. Watson contends that only structural differences of apparatus claims can render claims patentably distinct. Further, Watson argues that the purpose of its amendments and accompanying remarks filed in response to the examiner's rejection was to distinguish the structure of Claim 1 from the structure taught in the Easton patent, *i.e.* Watson's "chocks" or "load transfer means" from Easton's "shock absorber." In addition, Watson asserts that when construing claims, it is improper to incorporate statements of intended use as limitations on the language describing the apparatus claimed as the invention.

### *LEGAL PRINCIPLES*

Claim construction is a question of law. *Markman v. Westview Instruments, Inc.,* 52 F.3d 967, 979 (Fed.Cir.1995), *aff'd,* 517 U.S. 370, 116 S.Ct. 1384, 134 L.Ed.2d 577 (1996). In *Hockerson–Halberstadt, Inc. v. Avia Group Int'l, Inc.,* 222 F.3d 951 (Fed. Cir.2000), the Federal Circuit explained the parameters of claim construction analysis:

Proper claim construction entails an analysis of a patent record's intrinsic evidence—the claim language, the written description and the prosecution history. If the meaning of a claim is unambiguous from the intrinsic evidence, then a court may not rely on extrinsic evidence for purposes of claim construction.

Claim construction analysis begins with the claim language itself. As a starting point, the court gives claim terms their ordinary and accustomed meaning as understood by one of ordinary skill in the art.

The claim term's ordinary and accustomed meaning initially serves as a default meaning because the patentee may act as a lexicographer and ascribe a different, or modified, meaning to the term. The court, therefore, must examine a patent's specification and prosecu-

tion history to determine whether the patentee has given the term an unconventional meaning. If the patentee has not done so, the term's ordinary and accustomed meaning controls.

*Id.* at 955.

### THE EFFECT OF "DUMPING TRAILER" AND "DUMPING OPERATIONS"

While the court will address each of the claim elements in turn below, it is necessary at the outset to resolve what effect language referring to dumping trailers and dumping operations has on the scope of the '953 patent. Boler contends that Watson's amendments and accompanying remarks to the examiner's rejection of Claim 1 limited the scope of the patent to dumping trailers engaged in dumping operations. In effect, Boler argues that Watson attempted to establish the patentability of its claimed apparatus over a prior art reference (the Easton patent) by pointing out that its apparatus had a different intended use. Contrary to Boler's assertion, however, "the grant of a patent on a composition or a machine cannot be predicated on a new use of that machine or composition." *In re Hack,* 44 C.C.P.A. 954, 245 F.2d 246, 248 (Cust. & Pat.App. 1957); *see also In re Schreiber,* 128 F.3d 1473, 1477 (Fed.Cir.1997) ("It is well settled that the recitation of a new intended use for an old product does not make a claim to that old product patentable."); *In re Pearson,* 494 F.2d 1399, 1403 (Cust. & Pat.App.1974) (intended use of an old composition does not render composition claim patentable); *In re Zierden,* 56 C.C.P.A.

1223, 411 F.2d 1325, 1328 (Cust. & Pat. App.1969) ("[M]ere statement of a new use for an otherwise old or obvious composition cannot render a claim to the new composition patentable"); *In re Sinex,* 50 C.C.P.A. 1004, 309 F.2d 488, 492 (Cust. & Pat.App.1962) (statement of intended use in an apparatus claim failed to distinguish over the prior art apparatus). Thus, Watson's amendment and accompanying remarks could not have established the patentability of Claim 1 if their sole basis was that Watson had discovered that the invention disclosed in the Easton patent could be used on dumping trailers.[1]

The court notes that element (f) of Claim 2 refers to "load transfer means." Claim 2 was allowed by the examiner. Claim 1, however, with its reference to "chock means" was rejected. The structure referred to by the '953 examiner as the "chock means" taught in the Easton patent consists of shock absorbers between the arms and vehicle frame in the invention. In response to the examiner's finding, Watson amended element (g) to refer to "a ·plurality of chocks" rather than "chock means." The court concludes that by amending the claim in such a manner, Watson was attempting to show that the "chock means" was not the shock absorber taught by Easton, but rather were actually chocks, i.e. blocks or wedges.[2] In other words, Watson was attempting to demonstrate a structural distinction between the two inventions, rather than a functional distinction or a distinction based on use. Indeed, in its remarks to the examiner, Watson stated that Claim 1 was amended to "more clearly distinguish the present

---

1. The court notes that an inventor may obtain a blocking patent on the a useful nonobvious use of a machine or composition, 35 U.S.C. § 101; 35 U.S.C. 100(b), but there is nothing in the record that shows that Watson sought such a patent. Also, the examiner found that

the use of Easton's suspension system on a dump vehicle was obvious thereby precluding the allowance of a blocking patent.

2. The definition of "chock" will be discussed in more detail later in the opinion.

invention from the *structure"* described by Easton (emphasis added).

Furthermore, in its remarks to the examiner, Watson attempted to make clear that the "chocks" were a load transfer means, unlike the shock absorber taught in the Easton patent. While Watson added "dumping operations" to claim (g) and referred to "a dumping trailer" in its remarks to the examiner, the court concludes that such references were intended to show that a shock absorber would not operate as a load transfer means necessary to a dumping operation. The description of the prior art in the '953 patent states that the "Easton design is directed to restraining lateral movement of air cells when the vehicle is making a sharp turn. As such, the Easton design does not teach anything structurally or functionally similar to the invention described in the present application ..." Put simply, in light of the prosecution history and the patent as a whole, the examiner could have allowed Claim 1 only if he was convinced that the load transfer means consisting of the plurality of chocks was different from Easton's shock absorber. The claim could not have been allowed if Watson had simply been claiming, as the examiner initially found, that Easton's invention could be used on a dumping trailer.

■■■ It is important to remember that, generally, the description of the use of an invention does not limit the claims because the patentability of an apparatus or composition claims depends on the claimed structure, not on the use or purpose of that structure. *In re Gardiner,* 36 C.C.P.A. 748, 171 F.2d 313, 315–16 (Cust. & Pat.App.1947); *see also Catalina Marketing International, Inc. v. Coolsavings.com, Inc.,* 289 F.3d 801, 809 (Fed.Cir. 2002). "The inventor of a machine is enti-

tled to the benefit of all the uses to which it can be put, no matter whether he had conceived the idea of the use or not." *Roberts v. Ryer,* 91 U.S. 150, 157, 1 Otto 150, 23 L.Ed. 267 (1875). This means that a patent grants the right to exclude others from making, using, selling, offering to sale, or importing the claimed apparatus or composition for any use of that apparatus or composition, whether or not the patentee envisioned such use. *Catalina,* 289 F.3d at 809. Because the patentability of an apparatus does not depend on the use of the structure and because an inventor is entitled to all the uses of his apparatus, the court concludes that the references to "dumping" in the '953 patent do not limit the claims to dumping trailers only. The claims at issue here define a structurally complete invention, one that could be used on a "dumping trailer" or a different type of trailer. The terms "dumping trailer" and "dumping operations" are not essential to define or understand what is claimed, and therefore these terms do not diminish or limit the scope of the claims. *See Catalina,* 289 F.3d at 809 (where reference to intended use in preamble may be deleted without affecting the structure or steps of invention, reference to intended use is not limiting).

## CLAIM 1

The court now turns to the interpretation of the terms in Claim 1.

"1. A pivot stop for a dumping trailer comprising:"

Boler argues that the preamble of Claim 1 should be interpreted as "A pivot stop to be used on a dump trailer (not on a non-dumping trailer, such as a van trailer)." Watson contends that the preamble should be interpreted as a "Preamble for a claimed apparatus comprising."[3] In light

---

3. The parties' interpretations of the claims are taken from comparative charts each party

of the court's conclusion that references to the intended use of the claimed apparatus do not limit the scope of the claim, the court construes the preamble as a in the manner Watson suggests.

(a) "a plurality of primary frame members;"

Having reviewed the parties' proposed interpretations, the court construes element (a) as "more than one primary frame member affixed to a vehicular framework."

(b) "a hanger extending downward from each side of said primary frame members;"

Boler interprets element (b) as "a structure or a thing, attached to the frame members, that extends toward a lower place." Watson, on the other hand, defines this term as "a structure or a thing extending toward a lower place." Boler contends that its interpretation is more appropriate because it advises one ordinarily skilled in the art what the "structure or thing" is attached to, i.e. the frame members. The court agrees with Boler and therefore defines element (b) as "a structure or a thing, attached to the frame members, that extends toward a lower place."

(c) "an arm pivotally connected to each of said hangers;"

Having reviewed the parties' proposed interpretations, the court construes element (c) as "an arm-like structure pivotally attached to each of said structures or things."

(d) "an axle seat attached to each of said arms;"

■ Watson uses the dictionary definition of "axle" and "seat" to propose an interpretation of this element as "a part or surface joined to or made a part of each arm adapted for contacting an axle." Bol-

er asserts that the element should be interpreted as "any structure used to attach the axle to the suspension arms." Boler contends that Watson's interpretation is not consistent with the specification of the '953 patent because the specification shows an air spring or suspension spring between the axle seat and the plate affixed to the frame members. Boler also contends that the trucking industry's understanding of "axle seat" does not support Watson's proposed definition.

■ Claims define the invention and it is claims that are infringed, not specifications. *See E.I. du Pont de Nemours & Co. v. Phillips Petroleum*, 849 F.2d 1430, 1433 (Fed.Cir.1988); *SRI Int'l v. Matsushita Elec. Corp. of America*, 775 F.2d 1107, 1121 (Fed.Cir.1985). While claims are to be interpreted in light of the specification, this does not mean that everything expressed in the specification will be read into the claims. *Id.; see also Johnson Worldwide Assocs., Inc. v. Zebco Corp.*, 175 F.3d 985, 988 (Fed.Cir.1999) ("[M]ere inferences drawn from the description of an embodiment of the invention cannot serve to limit claim terms"); *Laitram Corp. v. Cambridge Wire Cloth Co.*, 863 F.2d 855, 865 (Fed.Cir.1988) ("References to a preferred embodiment, such as those often present in a specification, are not claim limitations."). As the Federal Circuit explained in *SRI Int'l:*

If everything in the specification were required to be read into the claims, or if structural claims were to be limited to devices operated precisely as a specification-described embodiment is operated, there would be no need for claims. Nor could an applicant, regardless of the prior art, claim more broadly than that embodiment. Nor would a basis remain for the statutory necessity that an appli-

filed after the Markman hearing.

cant conclude his specification with 'claims particularly pointing out and distinctly claiming the subject matter which the applicant regards as his invention.'

*Id.* at 1121 (citations omitted).

 A specification may be used to interpret what a patentee meant by a particular word or phrase in the claim. *E.I. du Pont de Nemours & Co.*, 849 F.2d at 1433. However, it is improper to read a limitation into the claim from a specification "wholly apart from any need to interpret what the patentee meant by particular words or phrases in the claim." *Id.* " 'Where a specification does not *require* a limitation, that limitation should not be read from the specification into the claims.' " *Id.* (quoting *Specialty Composites v. Cabot Corp.*, 845 F.2d 981, 987 (Fed.Cir.1988)) (emphasis in original).

Having reviewed the intrinsic evidence, the court concludes that the term "axle seat" is unambiguous and may be defined by the ordinary meaning of the words that make up the term. *Gentex Corp. v. Donnelly Corp.*, 69 F.3d 527, 530 (Fed.Cir. 1995). While the specification does describe an air spring mounted on the axle seat, this description of an embodiment is not necessary to interpret or understand the meaning of the term "axle seat." Nothing in the claims or the specification leads one to conclude that the structure termed an "axle seat" must be located between an axle and an air or suspension spring. To limit the term in the manner Boler suggests would require improperly reading an "extraneous" limitation from the specification into the claims. *E.I. du Pont de Nemours & Co.*, 849 F.2d at 1433 (an "extraneous" limitation is one that is read into a claim from a specification "wholly apart from any need to interpret what the patentee meant by particular words or phrases in the claim."). Thus,

the court construes element (d) in the manner Watson proposes.

(e) "a set of air springs extending between said axle seats and said primary frame members;"

 Watson interprets this element as "a number of air cushions/air actuated elastic or resilient devices lying in a space that separates the axle seats and the primary frame members." Boler asserts that the element should be construed as "a set of air springs reaching across the distance between and attaching to said axle seats and said frame members." Boler argues that Watson's proposed definition is not consistent with the specification because the specification states that the air springs are mounted between the top plate and the axle seat. The court disagrees with Boler. Simply because the specification states that the air spring is mounted between the axle seat the top plate does not necessarily mean, in light of the claim language, that the air spring must be *attached* to the axle seat and frame members. *Laitram Corp.*, 863 F.2d at 865. However, the court adopts a portion of Boler's interpretation. The court construes this element as "a number of air cushions reaching across the distance between the axle seats and primary frame members."

(f) "a cantilever section of each of said arms extending beyond said axle seats;"

The parties agree that this term should be construed as "a segment of an arm supported at one end extending past an axle seat."

(g) "a plurality of chocks mounted to and extending downward from said primary frame members for contacting each of said cantilever sections of said arms and for transferring load from said primary frame members to said arms during dumping operations."

■ Boler's proposed interpretation relies heavily on its contention that the term "dumping operations" is a term of limitation. As discussed above, the court disagrees with Boler's contention. Boler also asserts that Watson limited the scope of claim 1 to "chocks" by replacing the term "chock means" with "a plurality of chocks" in element (g) in response to the examiner's initial rejection of Claim 1. Boler further argues that because Watson uses the term "chock" interchangeably with the term "saddle" on two occasions in the specification when describing a structure that is mounted to the frame members, the term "chock" should be defined as a "saddle-like structure." In contrast, Boler uses the dictionary definition of the term to define a "chock" as a block or wedge. The court concludes that simply because the preferred embodiment set forth in the specification uses the term chock and saddle interchangeably does not mean that a saddle-like structure is the only embodiment of the apparatus. *Laitram Corp.*, 863 F.2d at 865. Accordingly, the court construes this element as "more than one block or wedge placed under a vehicular frame to keep it from moving, mounted on or attached to and extending below the primary vehicular framework members, adapted for touching the cantilever section of the arms, for stabilizing a vehicle by shifting or transferring the weight that a vehicle bears from the vehicular framework members to the arms."

### CLAIM 2

2. "An air suspension dump trailer stabilizing device comprising:"

The court construes the preamble of claim 2 as "Preamble for a claimed apparatus comprising."

(a) "a support frame to which the trailer is mounted;"

This term may be defined by the ordinary meaning of the terms as "a skeletal framework or other structure for a towed vehicle."

(b) "a plurality of hangers connected to said support frame;"

The court construes this element as "more than one structure or thing joined or fastened to the support frame and extending toward a lower place."

(c) "an arm member pivotally connected to each of said hangers;"

Having reviewed the parties' proposed interpretations, the court construes this element as "an arm-like structure pivotally attached to said structure or thing."

(d) "an axle seat affixed to each of said arm members;"

In light of the court's construction of element (d) of claim 1, the court construes this element as "a part or surface joined to or made a part of each arm adapted for contacting an axle."

(e) "air springs extending from said axle seats to said support frame;"

In light of the court's construction of element (e) in Claim 1, the court construes this element as "air cushions reaching across the distance between the axle seats and the support frame."

(f) "load transfer means affixed to a cantilever section of said arm members, said load transfer means serving to transfer load from said support frame to said arm members during dumping operations;"

Having reviewed the parties' proposed interpretations, the court construes this element as "each arm member has a chock or an equivalent thereof joined to or made a part of the arm supported at one end for stabilizing a vehicle by shifting or transferring the weight that the vehicle bears from the frame to the arms."

### CLAIM 9

9. "A device for stabilizing an air spring suspension dump trailer during dumping operations comprising:"

The court construes the preamble of Claim 9 as "Preamble for a claimed apparatus comprising:"

(a) "a support frame;"

The court construes this element as "a skeletal framework or similar structure for a vehicle;"

(b) "a plurality of axle seats;"

The court construes this elements as "more than one part or surface adapted for contacting an axle;"

(c) "a plurality of air springs extending from said support frame to said axle seats;"

The court construes this element as "air cushions reaching across the distance between said axle seats and the support frame;"

(d) "a plurality of hangers affixed to said support frames;"

The court construes this element as "more than one structure or thing joined to or made a part of the support frame and extending toward a lower place."

(e) "a plurality of arm members have proximal and distal ends, said proximal end of each of said arm members being pivotally connected to said hangers with said axle seats being connected to said arm members between said proximal and distal ends;"

Having reviewed the parties' proposed interpretations, the court construes this elements as "more than one arm-like structure having two ends, pivotally attached to or mounted on a structure or thing, and having an axle seat joined or fastened to each arm between its two ends."

(f) "a first set of chocks mounted to said arm members between said axle seats and said distal ends;"

The court construes this element as "a set of blocks or wedges mounted to the arms being located on each arm between the axle seat and the end of the arm that is farthest from the point of attachment between the arm and the structure or thing."

(g) "a second set of chocks affixed to said support frame, said first set of chocks contacting said second set of chocks during dumping operations;"

The court construes this element as "a second set of blocks or wedges joined to or made a part of the support frame adapted for touching the first set of chocks."

### CONCLUSION

For the foregoing reasons, the court interprets the claim language at issue in this case in the manner set forth above. For ease of reference, the court's interpretation of the claims is set forth in tabular form in Appendix A.

**CLAIM CONSTRUCTION CHART FOR CLAIM 1 OF THE '953 PATENT**

| Claim 1 of the '953 Patent | Court's Interpretation |
| --- | --- |
| "A pivot stop for a dumping trailer comprising:" | "Preamble for a claimed apparatus comprising:" |
| "(a) a plurality of primary frame members;" | "(a) more than one primary frame member affixed to a vehicular framework;" |
| "(b) a hanger extending downward from each of said primary frame members;" | "(b) a structure or a thing, attached to the frame members, that extends toward a lower place;" |

| | |
|---|---|
| "(c) an arm pivotally connected to each of said hangers;" | "(c) an arm-like structure pivotally attached to each of said structures or things;". |
| "(d) an axle seat attached to each of said arms;" | "(d) a part or surface joined to or made a part of each arm adapted for contacting an axle;". |
| "(e) a set of air springs extending between said axle seats and said primary frame members;" | "(e) a number of air cushions reaching across the distance between the axle seats and primary frame members;" |
| "(f) a cantilever section of each of said arms extending beyond said axle seats;" | "(f) a segment of an arm supported at one end extending past an axle seat;" |
| "(g) a plurality of chocks mounted to and extending downward from said primary frame members for contacting each of said cantilever sections of said arms and for transferring load from said primary frame members to said arms during dumping operations." | "(g) more than one block or wedge placed under a vehicular frame to keep it from moving, mounted on or attached to and extending below the primary vehicular framework members, adapted for touching the cantilever section of the arms, for stabilizing a vehicle by shifting or transferring the weight that a vehicle bears from the vehicular framework members to the arms." |

### CLAIM CONSTRUCTION CHART FOR CLAIM 2 OF THE '953 PATENT

| Claim 2 of the '953 Patent | Court's Interpretation |
|---|---|
| "An air spring suspension dump trailer stabilizing device comprising:" | "Preamble for a claimed apparatus comprising:" |
| "(a) a support frame to which the trailer is mounted;" | "(a) a skeletal framework or other structure for a towed vehicle;" |
| "(b) a plurality of hangers connected to said support frame;" | "(b) more than one structure or thing joined or fastened to the support frame and extending toward a lower place;" |
| "(c) an arm member pivotally connected to each of said hangers;" | "(c) an arm-like structure pivotally attached to said structure or thing;" |
| "(d) an axle seat affixed to each of said arms members;" | "(d) a part or surface joined to or made a part of each arm adapted for contacting an axle;" |
| "(e) air springs extending from said axle seats to said support frame;" | "(e) air cushions reaching across the distance between the axle seats and the support frame;" |
| "(f) load transfer means affixed to a cantilever section of said arm members, said load transfer means serving to transfer load from said support frame to said arm members during dumping operations;" | "(f) each arm member has a chock or an equivalent thereof joined to or made a part of the arm supported at one end for stabilizing a vehicle by shifting or transferring the weight that the vehicle bears from the frame to the arms." |

### CLAIM CONSTRUCTION CHART FOR CLAIM 9 OF THE '953 PATENT

| Claim 9 of the '953 Patent | Court's Interpretation |
|---|---|
| "A device for stabilizing an air spring suspension dump trailer during dumping operations comprising:" | "Preamble for a claimed apparatus comprising:" |
| "(a) a support frame;" | "(a) a skeletal framework or similar structure for a vehicle;" |
| "(b) a plurality of axle seats;" | "(b) more than one part or surface adapted for contacting an axle;" |

"(c) a plurality of air springs extending from said support frame to said axle seats;"

"(c) air cushions reaching across the distance between said axle seats and the support frame;"

"(d) a plurality of hangers affixed to said support frames;"

"(d) more than one structure or thing joined to or made a part of the support frame and extending toward a lower place."

"(e) a plurality of arm members have proximal and distal ends, said proximal end of each of said arm members being pivotally connected to said hangers with said axle seats being connected to said arm members between said proximal and distal ends;"

"(e) more than one arm-like structure having two ends, pivotally attached to or mounted on a structure or thing, and having an axle seat joined or fastened to each arm between its two ends;"

"(f) a first set of chocks mounted to said arm members between said axle seats and said distal ends;"

"(f) a set of blocks or wedges mounted to the arms being located on each arm between the axle seat and the end of the arm that is farthest from the point of attachment between the arm and the structure or thing;"

"(g) a second set of chocks affixed to said support frame, said first set of chocks contacting said second set of chocks during dumping operations;"

"(g) a second set of blocks or wedges joined to or made a part of the support frame adapted for touching the first set of chocks."